FILED
2026 SEP 18 09:00 AM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-30596-0 SEA

SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF KING

| | |
|---|---|
| LI TAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COLUMBIA BANK, formerly known as UMPQUA BANK and successor by merger to COLUMBIA STATE BANK, an Oregon state-chartered commercial bank,<br><br>Defendant. | NO.<br><br>**CLASS ACTION COMPLAINT** |

## I. NATURE OF THE ACTION

1. Plaintiff Li Tan, individually and on behalf of all others similarly situated (the "Class," defined below), brings this action against Columbia Bank, formerly known as Umpqua Bank and successor by merger to Columbia State Bank ("Columbia" or the "Bank"), to recover losses caused by the Bank's alleged role in the fraudulent investment scheme operated by iCap Enterprises, Inc. and its affiliated entities (collectively, "iCap"). Tan asserts only direct claims that she



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

retained and did not assign or release to the iCap Liquidating Trust or bankruptcy estate.

2. Beginning no later than October 2018 and continuing through July 2023, the Christensens operated iCap as a Ponzi scheme. The iCap enterprise raised approximately $230 million from more than 1,800 investors in the United States and abroad through offerings of debentures, promissory notes, and other securities that were represented as real-estate investments.

3. From 2013 through 2022, iCap invested approximately $103 million in real-estate projects but generated a cumulative net return of only approximately $1.4 million. iCap nevertheless promised investors secure investments and steady returns supposedly generated by the yield from real-estate projects.

4. In fact, iCap used money from new investors and intercompany transfers to pay existing investors and other creditors, commingled investor funds among nominally separate entities, and diverted investor funds to insiders and affiliated entities.

5. iCap could not receive, commingle, transfer, and dissipate hundreds of millions of dollars without banking infrastructure. The Bank supplied that infrastructure and, as alleged below, provided hands-on, transaction-specific assistance.

6. For years, iCap was the largest deposit customer of the Bank's Issaquah, Washington branch. The Bank maintained iCap's operating and investor-funded accounts, accepted investor deposits and substantial physical-cash deposits, and



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

processed the transfers through which money moved among iCap entities and to Christopher "Chris" Christensen and entities he controlled.

7. The Bank's account-level information showed that approximately 95% of the funds deposited into iCap investment-entity accounts came from investors, intercompany transfers, and outside lenders rather than operations. From October 2018 through July 2023, approximately $585 million was withdrawn from iCap accounts; approximately 75% of the withdrawals consisted of payments to investors and intercompany transfers, while only approximately 20% related to real-estate projects or business operations.

8. The Bank's risk-management function repeatedly classified iCap entities as "HIGH" risk and conducted at least seventeen enhanced due-diligence reviews between August 24, 2021, and November 21, 2023. A 2020 investigation separately concluded that cash activity in iCap's accounts was "out of pattern for an investment firm."

9. Despite those findings, Columbia gave iCap extraordinary, white-glove treatment. The Bank continued the relationship, treated iCap's irregular activity as consistent with an ordinary real-estate investment business, and provided daily transaction assistance because iCap was a profitable and strategically important deposit customer.

10. The assistance was affirmative and transaction-specific. Among other things, the Bank warned iCap when checks would overdraw particular fund accounts, offered to pay those items if iCap moved money from other entities, facilitated



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

transfers used to cover investor payments, and offered to make transfers from iCap entities to Chris Christensen's personal account easier.

11. On June 9, 2026, in Miller v. Columbia Bank f/k/a Umpqua Bank, No. C25-1870-JLR (W.D. Wash.) (the "Trust Action"), the court denied Columbia's motion to dismiss the iCap Trust's claims for aiding and abetting fraud and aiding and abetting breach of fiduciary duty. Applying the federal pleading standard, the court held that the Trust had plausibly alleged Columbia's actual knowledge and substantial assistance. Plaintiff independently alleges the supporting facts in this Complaint.

12. Plaintiff asserts claims for aiding and abetting fraud, aiding and abetting breach of fiduciary duty, violation of the Washington State Securities Act, negligent performance of voluntarily undertaken services, civil conspiracy, and unjust enrichment, and seeks damages, restitution, statutory relief, interest, and other relief available under Washington law.

## II. PARTIES

13. Plaintiff LI TAN is a resident of King County, Washington. Tan purchased investment interests issued by iCap Pacific Income Fund 4, LLC and iCap Investments, LLC and invested total principal of $1,000,000.

14. Tan is a member of the proposed Class. Her claims arise from iCap's common fraudulent scheme and Columbia's alleged course of knowingly providing banking assistance that enabled iCap to receive, transfer, commingle, and divert investor funds.



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

15. Tan did not assign or release the direct claims asserted in this action to the iCap Liquidating Trust or bankruptcy estate. She seeks recovery only on her own direct claims against the Bank, separate from claims pursued by the Trust.

16. Defendant COLUMBIA BANK is an Oregon state-chartered commercial bank and the banking subsidiary of Columbia Banking System, Inc. Columbia Bank maintains and transacts substantial business through branches in Washington, including the Issaquah branch at which the conduct alleged here occurred.

17. Before February 28, 2023, the relevant Issaquah banking relationship was maintained by Columbia State Bank, a Washington state-chartered bank. On February 28, 2023, Columbia State Bank merged into Umpqua Bank, with Umpqua Bank surviving and assuming Columbia State Bank's liabilities. Umpqua Bank's legal name changed to Columbia Bank effective July 1, 2025.

18. References in this Complaint to "Columbia" or the "Bank" include Columbia State Bank for conduct before the bank merger and its successors Umpqua Bank and Columbia Bank. References to "Umpqua" are used only when quoting or identifying records or proceedings that used that name.

19. At all relevant times, the Bank acted through officers, employees, and agents, including SVETLA TZEKOV, a Vice President and manager of the Issaquah branch and later a community or market manager, and the managers, treasury-management personnel, underwriters, and risk personnel who supervised or supported her. Those persons acted within the course and scope of their employment and for the Bank's benefit.



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

20. The Bank authorized Tzekov to manage the iCap relationship and act concerning iCap's accounts and transactions; management knew of and approved the effort to retain iCap; and the Bank ratified the resulting course of conduct by maintaining the accounts, accepting the deposits and fees, and continuing the relationship after repeated institutional reviews. The Bank is vicariously liable for conduct undertaken within the actual or apparent authority of its officers, employees, and agents.

## III. JURISDICTION AND VENUE

21. This Court has subject-matter jurisdiction under article IV, section 6 of the Washington Constitution and the Washington State Securities Act, including RCW 21.20.430.

22. This Court has personal jurisdiction over Columbia because Columbia transacts substantial, continuous business in Washington and purposefully directed the conduct alleged here through its Issaquah branch and Washington personnel. The asserted claims arise from that Washington conduct. RCW 4.28.185.

23. Venue is proper in King County under RCW 4.12.025 because Columbia transacts business and maintains offices in King County and because a substantial part of the conduct giving rise to Plaintiff's claims occurred through the Issaquah branch.

24. Tan resides in King County. iCap was based in King County, the fraudulent scheme was centered in King County, and the relevant accounts were maintained and serviced in Washington.



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

25. Washington law governs the claims asserted. Washington has the most significant relationship to the conduct and injuries at issue and a substantial interest in regulating banking and securities-related conduct occurring within this State.

## IV. FACTUAL ALLEGATIONS

### A. iCap and the Christensen Brothers

26. Chris Christensen formed iCap Enterprises, Inc. on August 9, 2007, and formed its direct subsidiary iCap Equity, LLC on August 15, 2011. iCap operated from Bellevue, Washington.

27. Chris Christensen served as iCap's Chief Executive Officer, and his brother James "Jim" Christensen served as Chief Operating Officer and held other senior-management positions. Through those positions and the governing documents of the iCap entities, the Christensens exercised control and broad discretion over the investment entities, investor funds, real-estate investments, and distributions.

28. Between 2011 and 2023, iCap operated a portfolio business and a vault business and raised money through private and public offerings of debentures, promissory notes, demand notes, and other debt and equity securities. The offered instruments promised interest rates or returns and were marketed as financing real-estate investments and development projects.

29. Ultimately, iCap raised approximately $230 million from more than 1,800 investors in the United States and abroad.

30. Although iCap issued securities through multiple affiliated entities and offerings, the offerings rested on common representations and omissions: that investor



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

funds would be deployed in legitimate real-estate investments; that returns and repayments would come from investment performance and business operations; that investments would be secure; and that iCap would act honestly and transparently for investors' benefit.

31. Those representations omitted that iCap lacked sufficient operating returns to satisfy its obligations, used new investments and intercompany transfers to pay existing investors and creditors, commingled funds among nominally separate investment vehicles, and diverted investor funds to insiders and affiliated entities.

32. The October 2018 private-placement memorandum for iCap Pacific Income Fund 4, LLC ("Fund 4") stated that the Fund's primary purpose was to acquire United States real-estate investments and provide a return to investors and that offering proceeds would be used to acquire and manage preferred-equity real-estate positions through portfolio special-purpose entities, subject to identified formation, operating, offering, and commission expenses.

33. Those statements were materially false or misleading. Between October 2018 and September 2023, approximately $23.9 million was deposited into Fund 4's Bank account, including approximately $12.4 million from investors and $11.4 million in intercompany transfers. Fund 4 paid approximately $4.9 million to investors and transferred approximately $9.5 million to other iCap entities, while using only approximately $2.2 million for real-estate acquisition, development, and investment. Only approximately 9.7% of Fund 4's withdrawals were used for real-estate projects.



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

**B. iCap Operated as a Ponzi Scheme**

34. Beginning no later than October 2018 and continuing through July 2023, iCap operated as a Ponzi scheme: it lacked sufficient legitimate operating returns to meet existing obligations and used new-investor funds and funds earmarked for other purposes to pay existing investors and creditors.

35. From 2013 through 2022, the iCap entities invested approximately $103 million in real-estate projects but generated a cumulative net return of only approximately $1.4 million after exiting those projects.

36. Intercompany transfers comprised a substantial portion of iCap's overall cash activity and effectively pooled funds among nominally separate entities. Internal communications described twice-monthly transfers used to cover interest payments and investor redemptions, including transfers into Fund 4 to cover Fund 4 investor payoffs.

37. From October 2018 through July 2023, approximately $585 million was withdrawn from iCap accounts at the Bank. Approximately 75% of the withdrawals related to returns to investors and intercompany transfers, while only approximately 20% related to real-estate projects or business operations.

38. Later iCap funds, including Fund 4 and iCap Investments, returned materially less to investors on average than the investors' original principal. iCap's apparent performance depended on continuing inflows of new capital rather than profitable real-estate operations.



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

39. From 2013 through 2023, Chris Christensen transferred approximately $30,469,282 in investor funds from iCap accounts to his personal accounts, entities he owned or controlled, accounts used for lifestyle expenses and vacation properties, or creditors holding his personal obligations. The transfers were falsely recorded as loans, reimbursements, or distributions, and the purported loans were not repaid.

40. For example, in January 2016, $450,000 was transferred from iCap Pacific NW Management to Oceanaire, LLC, an entity associated with Chris Christensen's vacation property, followed by a wire of approximately $469,122.96 to a title company for the purchase of that property.

41. On September 28, 2023, the scheme collapsed and Chris Christensen resigned his iCap positions. On September 29, 2023, iCap and numerous affiliates filed chapter 11 cases in the United States Bankruptcy Court for the Eastern District of Washington, Case No. 23-01243-WLH11.

42. On October 18, 2024, the Bankruptcy Court confirmed a liquidation plan and found, based on the evidence presented at confirmation, that the iCap enterprise operated as a Ponzi scheme beginning no later than October 2018 through July 2023, raised approximately $230 million from more than 1,800 investors, used new-investor funds to pay existing investors and other creditors, and did not operate as a legitimate profit-making business.

### C. Tan's Investments, Reliance, and Loss



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

43. In February 2020, Tan invested approximately $500,000 in Fund 4. She transmitted the investment consideration to an account maintained by Columbia State Bank.

44. Before making that investment, Tan received Fund 4 offering and subscription materials issued by iCap, including the Fund 4 private-placement memorandum and promissory-note documents. Those materials represented, among other things, that Fund 4's primary purpose was to acquire United States real-estate investments and provide investors a return and that proceeds would be used to acquire and manage preferred-equity real-estate positions, subject to disclosed expenses.

45. Tan reasonably understood those written representations to mean that her principal would be deployed substantially in legitimate real-estate investments and that returns and repayment would come from those investments—not from later investors, undisclosed commingling, or diversion to insiders. She relied on those representations and would not have invested had the omitted truth been disclosed.

46. In August 2020, Tan invested approximately $500,000 in iCap Investments, LLC. She transmitted the investment consideration to an account maintained by Columbia State Bank.

47. Before making that investment, Tan received subscription, promissory-note, and related written materials issued by iCap Investments and transmitted by iCap representatives. Those materials represented that her investment would support



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

legitimate real-estate investment activity, would bear the stated interest or return, and would be repaid according to its terms. They did not disclose that iCap was operating a Ponzi scheme, commingling investment proceeds, using new money to satisfy prior obligations, and diverting investor funds to insiders.

48. Tan reasonably relied on those representations and omissions and would not have invested in iCap Investments had she known the concealed facts.

49. Tan requested repayment on or about January 3, February 6, and February 14, 2023, but iCap did not repay her. On February 28, 2023, Tan met with Chris Christensen, who promised that her funds would be repaid by March 7, 2023. No repayment followed.

50. After crediting all amounts received, Tan's presently unrecovered principal on her Fund 4 and iCap Investments investments is $1,000,000.

**D. Plaintiff's Discovery of Columbia's Role**

51. When iCap failed to repay Tan and later entered bankruptcy, Tan knew that iCap had defaulted and that iCap and its principals had engaged in misconduct. She did not then know that Columbia had allegedly acquired actual knowledge of the scheme, repeatedly classified iCap as high risk, observed the commingling and diversion of investor funds, or affirmatively assisted the transactions that prolonged the scheme.

52. The facts concerning Columbia's role were contained principally in nonpublic Bank records, including internal emails, account records, risk classifications, enhanced due-diligence reports, investigation materials, underwriting records,



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

and treasury-management communications. Tan had no access to those records when she invested or when iCap defaulted.

53. On September 25, 2025, the iCap Investment Trust filed an action against the Bank in the United States District Court for the Western District of Washington. Through her role as a member of the Trust Board, Tan became aware that the Trust had asserted claims against the Bank. At that time, however, Tan did not understand the specific factual basis for the Bank's alleged involvement, the nature or extent of the Bank's alleged misconduct, or that she might possess direct claims against the Bank separate from those asserted by the Trust.

54. On June 10, 2026, after the federal court's order denying Columbia's motion to dismiss and related information, Tan first clearly understood the specific facts and seriousness of the Bank's alleged misconduct, including its internal high-risk determinations, knowledge of iCap's misuse and commingling of investor funds, and affirmative transaction-specific assistance. Before September 25, 2025, Tan did not know, and through reasonable diligence could not have discovered, facts suggesting that Columbia's role extended beyond providing ordinary banking services.

**E. The Bank's Lucrative and Closely Managed iCap Relationship**

55. The iCap entities maintained their principal operating and investor-funded accounts through the Bank's Issaquah branch. An October 22, 2019 internal email described iCap as the branch's "largest deposit customer."



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

56. Tzekov was the Bank's principal contact for the Christensens and was responsible for servicing and monitoring iCap's corporate accounts and related personal accounts. A June 8, 2020 internal email stated that Tzekov had worked closely with iCap since 2013 and knew its business "inside and out."

57. In a June 30, 2023 email, Tzekov described iCap as her largest deposit client for the preceding eight to ten years, called it a "very profitable and big relationship," and stated that it had consistently generated approximately $2,000 to $4,000 per month in treasury-management fee income.

58. The Bank measured branch success and employee compensation in part by deposit volume, account growth, and retention. Losing iCap's deposits threatened the Issaquah branch's performance and the compensation and job security of personnel responsible for the relationship.

59. The Bank therefore gave iCap extraordinary, white-glove treatment. Tzekov cultivated a close relationship with Chris Christensen, visited iCap's offices, assisted with daily transactions and transfers, handled significant amounts of physical cash, and at one point sought employment with iCap.

60. The Bank's paid treasury-management role extended beyond passively maintaining deposit accounts or mechanically executing isolated payment instructions. Through Tzekov and other personnel, Columbia provided recurring, transaction-specific assistance concerning the timing, source, and method of transfers among iCap entities and from iCap entities to Chris Christensen personally.



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

61. On February 25, 2022, Tzekov informed the Christensens and other iCap personnel that a $97,000.82 check from Fund 4 had been presented but that Fund 4 lacked sufficient funds. She offered to "push it through for payment" if iCap identified another account from which funds could be transferred. iCap's accounting manager then transferred $6,500 from iCap Equity, and Tzekov processed the transaction.

62. On April 5, 2022, Tzekov told iCap personnel that a $20,000 payment to an investor had pushed an account into insufficient-funds status and offered to pay the items if iCap transferred funds before 10:00 a.m. An iCap accountant, copying Tzekov, requested a transfer from Fund 3 to Fund 2 to avoid the insufficient-funds condition.

63. On May 3, 2021, Chris Christensen informed Tzekov that he needed to transfer funds from an iCap entity to his personal account, expected to do so more frequently, and wanted an easier method. Tzekov replied that the Bank could process the transfers whenever he told her "when and how much" and consulted the treasury-management team about the "easiest way" for him to make the transfers himself.

64. On January 21, 2022, Chris Christensen requested wires of $292,125 and $99,000 into his personal accounts. Tzekov replied that she was "happy to assist."

65. iCap also brought substantial physical cash to the branch. During a 2020 investigation, the Bank identified approximately $400,000 in cash deposits during the review period, including a cash deposit associated in time with a same-day



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

$100,000 international wire to an investor. iCap could not provide a clear source for the cash deposits.

**F. The Bank's Knowledge and High-Risk Findings**

66. The Bank's customer-identification, KYC, customer-due-diligence, and enhanced-due-diligence processes gave it detailed information concerning iCap's ownership, organizational structure, stated business, expected activity, sources of deposits, account balances, and transactions.

67. The Bank obtained and reviewed iCap organizational documents, operating agreements, financial statements, tax returns, account activity, and related records. Those materials showed that the accounts held investor funds intended for real-estate investments and that the Christensens exercised broad control over iCap and its investment entities.

68. In responding to a 2020 Financial Investigations Department inquiry concerning $413,085 in cash deposited into iCap accounts, Tzekov identified the source as iCap's "Investors . . . clients' funds." She separately explained that an outgoing international wire was an investor redemption of capital.

69. The Bank had direct visibility into the source and use of iCap funds. Approximately 95% of deposits into the investment-entity accounts came from investors, other iCap entities, and external lenders—not from business operations.

70. The Bank also saw that, from October 2018 through July 2023, approximately 75% of iCap withdrawals were investor payments and intercompany transfers and only approximately 20% related to real-estate projects or business operations.



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

71. The Bank repeatedly saw negative balances, overdrafts, and transfers from one nominally separate entity to cover another entity's investor obligations. For example, from October 2018 through July 2023, approximately 91% of Fund 1's deposits were intercompany transfers and approximately 91% of Fund 1's withdrawals paid investors.

72. The Bank saw large transfers from iCap entities to Chris Christensen's personal accounts and related entities, including transfers of $150,000 and $250,000 from iCap Investments in 2020, transfers of $292,125 and $99,000 in January 2022, and the vacation-property transactions described above.

73. The Bank's underwriting group separately reviewed iCap's tax returns in 2019 and questioned how Chris Christensen was paying himself while iCap businesses were reporting "huge losses in the millions." The Bank declined to risk its own funds on his home-equity application but continued to accept and transfer investor funds through iCap's accounts.

74. In 2020, the Bank conducted a review of suspicious iCap activity and concluded that the cash deposits "appear[ed] out of pattern for an investment firm" and that iCap had not provided a clear source for the cash.

75. Between August 24, 2021, and November 21, 2023, the Bank conducted at least seventeen enhanced due-diligence reviews of iCap entities or affiliates. Each identified the customer's risk level as "HIGH."

76. The Bank therefore knew—not merely should have known—that iCap accounts contained investor funds, that iCap's legitimate operating returns could not



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

support its promised obligations, that nominally separate funds were being commingled to cover investor payments and shortfalls, and that substantial sums were being transferred to insiders without a legitimate investment purpose.

**G. The Bank Retained iCap and Continued the Assistance**

77. In September 2022, iCap used a competing bank's proposal to seek better terms from Columbia. Tzekov immediately sought help from senior personnel, describing iCap as a "huge business relationship" and asking for "all the support we can get."

78. Senior Bank personnel stated that Tzekov was in "serious danger of losing this relationship," that the Bank would "have to meet" the competing proposal, and that they did not want Tzekov to lose the deposits. The matter was elevated to an executive vice president for approval of a proposal to retain "this very important customer to the bank."

79. When iCap agreed to retain the accounts at Columbia, Bank personnel circulated congratulatory communications. Columbia continued the relationship even though another bank had determined it could not provide the oversight required to take on iCap's accounts.

80. The Bank's enhanced due-diligence reports repeatedly recommended only continued monitoring and characterized iCap's activity as consistent with the customer's normal history as a real-estate investment business, notwithstanding the Bank's contrary "out of pattern" finding and the account activity described above.



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

81. In 2019, a Bank employee completed a remote-deposit-capture application stating that the customer was not in a higher-risk line of business and had not experienced three or more overdrafts, even though the Bank's other records and Tzekov's repeated interventions reflected high risk and recurring account shortfalls.

82. Columbia continued accepting investor deposits, maintaining commingled accounts, processing thousands of transfers among iCap entities and to personal accounts, and providing transaction-specific assistance through the scheme's collapse.

**H. Columbia and Tzekov Exercised Control and Materially Aided the Securities Transactions**

83. The Bank and Tzekov possessed and exercised practical and actual control over essential parts of iCap's receipt, movement, retention, and payment of securities-sale proceeds through the Bank. That authority included approving and maintaining deposit and treasury-management services; accepting investor consideration; approving remote-deposit-capture access; determining whether insufficient-funds items would be paid; executing wires and intercompany transfers; selecting or requiring transfer methods; restricting transactions; and continuing or terminating the banking relationship on which iCap's offerings depended.

84. Tzekov exercised that authority as the Bank's principal iCap relationship manager. She decided whether the Bank would process particular transactions, conditioned payment of insufficient-funds items on transfers from other iCap



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

entities, directed the timing and mechanics needed to cure shortfalls, processed transfers to insiders, and sought easier mechanisms for future transfers.

85. Because iCap depended on Columbia accounts to receive investment consideration, make purported interest and redemption payments, and move offering proceeds among entities, the Bank's and Tzekov's authority gave them power to direct or cause the direction of material account-level policies and practices through which iCap offered and sold securities and continued its securities operations.

86. The Bank exercised that power with knowledge of the facts described above and to preserve a profitable deposit relationship. Tzekov acted within her actual or apparent authority; senior management approved retention of iCap; and the Bank ratified her conduct by continuing the relationship and retaining its benefits.

87. Columbia and Tzekov also materially aided the securities transactions by supplying and maintaining the accounts designated to receive investor consideration, accepting and processing that consideration, facilitating transactions that created the appearance that iCap could pay interest and redemptions, and enabling iCap to continue soliciting and receiving additional investments.

**I. Columbia and iCap Acted Pursuant to a Shared Understanding**

88. Columbia's relationship with iCap extended beyond an ordinary arm's-length banking relationship. Tzekov cultivated a close relationship with Chris Christensen, visited iCap's offices, assisted with daily transactions and physical



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

cash, and sought personal employment with iCap while managing the Bank relationship.

89. The parties repeatedly coordinated particular transactions. iCap identified payments, shortfalls, personal transfers, and timing needs; Columbia responded with warnings, proposed or required intercompany transfers, processed the transactions, and sought easier mechanisms to repeat them.

90. Upon information and belief, Columbia, acting through Tzekov and other personnel, and iCap, acting through Chris Christensen and other principals, reached at least a tacit understanding that Columbia would continue accommodating the transfers and shortfall-covering transactions necessary to keep iCap operating and would preserve the banking relationship despite the irregular and high-risk activity Columbia had identified.

91. The understanding included accomplishing the otherwise lawful objective of maintaining and growing the banking relationship through unlawful means: facilitating transactions that commingled, misused, and diverted investor funds and engaging in conduct that prevented or avoided scrutiny capable of interrupting the scheme. After Columbia knew that iCap was operating fraudulently, the shared objective also included sustaining iCap's operations and the continuing fraud.

92. The parties received reciprocal benefits. iCap received the banking infrastructure and transaction assistance necessary to remain operational and create an



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

appearance of liquidity; Columbia retained its largest Issaquah deposit customer, substantial deposits, and recurring treasury-management and transaction revenue.

**J. Columbia's Conduct Substantially Assisted the Fraud and Caused Loss**

93. Columbia affirmatively assisted the fraud and breaches of duty by maintaining accounts that received investor funds; accepting substantial physical cash; warning of and helping cure account shortfalls through intercompany transfers; processing payments that accounts could not independently cover; facilitating transfers to insiders and related entities; and continuing transaction-specific assistance despite its high-risk findings and actual knowledge.

94. That assistance permitted iCap to conceal recurring shortfalls, simulate returns and redemptions, remain operational, solicit and receive additional investments, and dissipate funds that otherwise would have remained available to satisfy investor obligations.

95. Columbia's assistance was a substantial factor in prolonging and expanding the scheme and in causing Tan's and the Class's losses.

**K. Bankruptcy, the Trust, and the Miller Order**

96. The confirmed liquidation plan created the iCap Liquidating Trust to pursue estate claims and claims assigned or contributed to it by individual investors. The Trust later filed the Trust Action against Columbia on behalf of assigning investors.



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

97. Tan did not assign the direct claims asserted here. The proposed Class likewise excludes persons who assigned, contributed, or released the direct claims asserted in this action.

98. On June 9, 2026, the court in the Trust Action denied Columbia's motion to dismiss the Trust's aiding-and-abetting claims. Accepting the pleaded facts as true, the court held that the Trust plausibly alleged actual knowledge based on Columbia's account-level information, high-risk classification, seventeen enhanced due-diligence reviews, organizational and financial records, knowledge of commingling, and knowledge of transfers to personal accounts.

99. The court also held that the Trust plausibly alleged substantial assistance through Columbia's processing of transfers, allowance of diversions for personal use, continued maintenance of the relationship, and failure to act on repeated investigations. The court did not adjudicate the truth of those allegations. Plaintiff independently alleges the underlying facts here based on the materials described above.

100. Plaintiff does not seek duplicative recovery. Any amounts actually received from the bankruptcy estate, the Trust, iCap, or another source may be credited in calculating an individual Class member's recoverable net loss to the extent required by law.

## V. CLASS ACTION ALLEGATIONS

101. Plaintiff brings this action under CR 23(a) and CR 23(b)(3) on behalf of the following proposed Class:



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

102. All persons and entities who, from October 2018 through September 28, 2023, purchased a security or investment instrument issued by an iCap entity, whose investment consideration was deposited into, transferred through, or held in an account maintained by the Bank, who suffered a net loss of principal, and who retained the direct claims asserted in this action.

103. Excluded from the Class are Columbia and its affiliates, officers, and directors; iCap insiders and their immediate families and affiliated entities; persons who received from iCap an amount equal to or greater than their invested principal; persons who assigned, contributed, or released the direct claims asserted here; the iCap Liquidating Trust and bankruptcy estate; and the Court and its staff.

104. Plaintiff reserves the right to refine the Class definition and to propose appropriate subclasses, including a Washington subclass or offering-specific subclasses, as warranted by discovery and the applicable law.

105. Class membership is objectively ascertainable from iCap's investor and payment records, bankruptcy and Trust records, proofs of claim, and Columbia's account and transaction records. Those records can identify each investor, purchase date and instrument, principal invested, receiving account, payments and distributions, claim-assignment status, and net principal loss.

106. If differences among offerings, instruments, transactions, or applicable law warrant separate treatment, Plaintiff alternatively requests certification of appropriate subclasses under CR 23(c)(4)(B) or certification of particular common issues under CR 23(c)(4)(A).



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

107. **Numerosity (CR 23(a)(1)).** The proposed Class is believed to include hundreds of geographically dispersed investors whose joinder is impracticable. The exact number and identities can be determined from common records.

108. **Commonality (CR 23(a)(2)).** Common questions include: (a) whether iCap operated as a Ponzi scheme; (b) when Columbia acquired actual knowledge of the fraud and fiduciary breaches; (c) whether Columbia substantially assisted that misconduct; (d) whether Columbia and Tzekov exercised control over, or materially aided, the securities transactions; (e) the scope and negligent performance of Columbia's voluntarily undertaken services; (f) whether Columbia joined a conspiracy; (g) whether Columbia was unjustly enriched; (h) when Columbia's nonpublic role became reasonably discoverable; and (i) the proper common methodologies for calculating relief.

109. Those questions are susceptible to common proof, including Columbia's account records, risk classifications, enhanced due-diligence reviews, investigation and underwriting records, internal communications, treasury-management records, deposit records, and records of transfers among iCap entities and to insiders.

110. **Typicality (CR 23(a)(3)).** Tan's claims are typical because she purchased iCap securities during the alleged Ponzi period, transmitted her consideration to Bank accounts, retained her direct claims, suffered an unrecovered principal loss, and challenges the same alleged course of Bank knowledge, control, assistance, and retention of benefits as the Class.



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

111. **Adequacy (CR 23(a)(4)).** Tan will fairly and adequately protect the Class. She has no interest antagonistic to the Class and has retained counsel experienced in complex securities, fraud, and class-action litigation.

112. **Predominance (CR 23(b)(3)).** Common questions concerning Columbia's own knowledge, institutional decisions, transaction assistance, control, and course of conduct predominate over individualized issues. Those issues turn principally on Columbia's records and iCap's common records, not on evidence unique to each investor.

113. Individual calculations principally concern the amount invested, payments and distributions received, and resulting net principal loss. Those calculations can be made from investor, banking, bankruptcy, and Trust records through a common accounting methodology and do not defeat predominance.

114. **Superiority (CR 23(b)(3)).** A class action is superior because proving Columbia's knowledge and conduct will require substantial common discovery, review of extensive Bank and iCap records, and expert analysis that would be inefficient to repeat in individual actions. Class treatment will conserve judicial resources and promote consistent adjudication.

115. The Trust Action does not eliminate the need for this action because this action excludes claims assigned to the Trust and seeks relief for investors who retained their direct claims. Coordination and appropriate accounting can prevent duplicative recovery.



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

116. Concentrating the litigation in King County is desirable because Tan resides here, iCap was based here, the scheme was centered here, and Columbia's Issaquah branch maintained and serviced the relevant accounts.

**COUNT I — AIDING AND ABETTING FRAUD**

117. Plaintiff realleges and incorporates by reference each preceding paragraph as though fully set forth here.

118. iCap and the Christensens committed fraud by making and causing the written and oral misrepresentations and omissions described above concerning the purpose and use of investment proceeds, investment security, business performance, source of returns, and ability and intent to repay investors.

119. Those representations and omissions were material and false. Tan reasonably relied on the representations and omissions made in connection with her Fund 4 and iCap Investments purchases and would not have invested had the truth been disclosed. The fraud induced the Class to purchase iCap securities and caused their losses.

120. Columbia had actual knowledge of the fraud. Its knowledge is shown by the combined account-level information, investor-fund identification, KYC and enhanced-due-diligence materials, high-risk determinations, investigation and underwriting findings, recurring shortfalls and overdrafts, commingling, transfers to insiders, and mismatch between iCap's stated business and actual cash flows alleged above.



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

121. With that knowledge, Columbia knowingly and substantially assisted the fraud through the affirmative acts alleged above, including processing shortfall-covering and insider transfers, maintaining the accounts and treasury-management infrastructure that received and moved investor money, and continuing the relationship and transaction assistance after discovering the scheme.

122. Columbia's assistance was a substantial factor in enabling iCap to continue appearing operational, solicit and receive additional investments, and dissipate investor funds. As a direct and proximate result, Tan and the Class suffered damages in amounts to be proven.

**COUNT II — AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

123. Plaintiff realleges and incorporates by reference each preceding paragraph as though fully set forth here.

124. By virtue of their positions, control, discretion over investor funds, and representations to investors, iCap and the Christensens owed Tan and the Class fiduciary duties, including duties of loyalty, care, candor, full disclosure, good faith, and avoidance of self-dealing and conflicts of interest.

125. iCap and the Christensens breached those duties by operating a Ponzi scheme, misusing and commingling investor funds, concealing iCap's condition, making false statements and omissions, and diverting investor funds to insiders and related entities for personal purposes.



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

126. Columbia actually knew of those duties and breaches through the customer and organizational documents it reviewed, its knowledge that the accounts contained investor funds intended for real-estate investments, and the account activity and transfers alleged above.

127. Columbia knowingly and substantially assisted the breaches by facilitating transfers through which investor funds were commingled and diverted, covering fund shortfalls with money from other iCap entities, enabling transfers to insiders, maintaining the relationship, and continuing transaction-specific services despite its actual knowledge.

128. Columbia's assistance was a substantial factor in the continuing breaches and dissipation of investor funds. As a direct and proximate result, Tan and the Class suffered damages in amounts to be proven.

**COUNT III — VIOLATION OF THE WASHINGTON STATE SECURITIES ACT (RCW 21.20.010 AND RCW 21.20.430)**

129. Plaintiff realleges and incorporates by reference each preceding paragraph as though fully set forth here.

130. The instruments purchased by Tan and the Class were securities within the meaning of RCW 21.20.005.

131. The iCap issuers and the Christensens offered and sold those securities through the untrue statements and omissions of material fact and the schemes and practices described above, in violation of RCW 21.20.010, and are liable to purchasers under RCW 21.20.430(1).



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

132. Columbia directly or indirectly controlled the liable sellers within the meaning of RCW 21.20.430(3). Acting through Tzekov and other authorized personnel, Columbia possessed and exercised power to direct or cause the direction of the material account-level policies and transactions through which iCap received securities-sale proceeds, paid purported returns and redemptions, transferred offering proceeds, and maintained the appearance of operations necessary to continue selling securities.

133. Tzekov exercised direct and indirect control over those functions within the actual or apparent authority Columbia delegated to her, including by deciding whether transactions would be processed, conditioning payment of insufficient-funds items on transfers from other iCap entities, directing transaction timing and mechanics, facilitating transfers to insiders, and maintaining the relationship. Her knowledge and conduct are attributable to Columbia, and Columbia ratified her conduct.

134. Columbia also materially aided the securities transactions by providing and maintaining the accounts designated to receive investor consideration, accepting and processing that consideration, facilitating payments that created the appearance of performance and liquidity, and supplying the transaction infrastructure without which iCap could not continue its offerings.

135. Columbia knew of the facts giving rise to liability. In light of its actual knowledge, high-risk classifications, seventeen enhanced due-diligence reviews, account-level visibility, investigation findings, and transaction-specific



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

assistance, Columbia cannot establish the statutory defense that it did not know and, in the exercise of reasonable care, could not have known of those facts.

136. Tan first discovered facts suggesting Columbia's actionable involvement in iCap's securities violations on September 25, 2025, and learned substantial additional facts concerning the nature and extent of that involvement on June 10, 2026. Before September 25, 2025, Tan neither discovered nor, through the exercise of reasonable care, could have discovered Columbia's alleged control, knowledge, and participation. This action was commenced within three years after the alleged violations were or reasonably could have been discovered.

137. Tan and the Class are entitled to the remedies provided by RCW 21.20.430, including recovery of consideration paid with statutory interest, costs, and reasonable attorneys' fees, less income received, or damages where applicable.

## COUNT IV — NEGLIGENT PERFORMANCE OF VOLUNTARILY UNDERTAKEN SERVICES

## (PLEADED IN THE ALTERNATIVE)

138. Plaintiff realleges and incorporates by reference each preceding paragraph as though fully set forth here.

139. Plaintiff pleads this Count in the alternative under CR 8(e)(2). If Columbia is not found to have possessed the actual knowledge alleged in Counts I and II, it nevertheless possessed the detailed account-level information alleged above and voluntarily undertook, for consideration, recurring transaction-specific treasury-management and cash-management services for iCap.



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

140. Columbia's undertaking was not limited to passively maintaining deposit accounts, mechanically executing isolated instructions, or conducting generalized regulatory monitoring. Columbia affirmatively undertook to monitor and address account shortfalls; advise iCap concerning the source, timing, and means of transfers; process items conditioned on intercompany funding; facilitate transfers used to satisfy obligations to investors; handle unusual physical cash; and develop easier methods for transferring iCap funds to Chris Christensen personally.

141. Columbia knew that reasonable care in performing those services was necessary to protect iCap investors and their funds. It knew that the accounts held investor money intended for real-estate investments, that iCap entities were nominally separate, and that careless performance would expose those funds to commingling, diversion, dissipation, and use to conceal recurring shortfalls.

142. The duty asserted here does not arise from a generalized duty to investigate customers, enforce the Bank Secrecy Act, file regulatory reports, or protect all noncustomers from a customer's misconduct. It arises from the particular transaction-specific services Columbia voluntarily and affirmatively undertook. Within the scope of that undertaking, Columbia had a duty to use reasonable care and not increase the danger to the investor funds it knew were moving through the accounts.

143. Columbia breached that limited duty by affirmatively advising and facilitating transfers among nominally separate iCap entities to cure shortfalls and pay investor obligations; processing items that the originating accounts could not



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

cover after arranging intercompany funding; facilitating transfers from iCap entities to insiders; and continuing hands-on transaction assistance after its own information showed that the activity was high risk and inconsistent with iCap's stated business.

144. Columbia's negligent performance increased the risk to investors beyond the risk that would have existed had it not undertaken those services. The assistance enabled iCap to complete transactions despite insufficient funds, move and dissipate investor money across nominally separate entities, transfer funds to insiders, conceal recurring shortfalls, and create a false appearance that iCap remained able to satisfy investor obligations.

145. iCap and the Christensens relied on Columbia's continuing undertaking by repeatedly alerting or responding to Columbia concerning shortfalls, timing transfers to meet Columbia's instructions, requesting Columbia's assistance with personal and intercompany transfers, and using the Bank's assistance to complete transactions and continue operations.

146. Columbia's negligent performance was a substantial factor in prolonging the scheme, dissipating funds that otherwise would have remained available, and reducing the funds available to repay Tan and the Class. As a direct and proximate result, Tan and the Class suffered losses in amounts to be established through common records and other evidence.

**COUNT V — CIVIL CONSPIRACY**



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

147. Plaintiff realleges and incorporates by reference each preceding paragraph as though fully set forth here.

148. iCap and the Christensens committed the underlying unlawful acts alleged above, including fraud, breaches of fiduciary duty, misappropriation and diversion of investor funds, securities-law violations, and operation of the iCap Ponzi scheme.

149. Upon information and belief, Columbia, acting through Tzekov and other personnel, and iCap, acting through Chris Christensen and other principals, entered into at least a tacit agreement under which Columbia would sustain and grow the relationship and assist iCap's continued operations by accommodating intercompany transfers, shortfall-covering transactions, investor payments, and transfers to insiders despite the irregular and high-risk activity Columbia had identified.

150. To the extent maintaining and growing the banking relationship was a lawful objective, Columbia and iCap agreed to accomplish it through unlawful means, including the knowing facilitation of transactions that commingled, misused, and diverted investor funds and conduct intended to prevent or avoid scrutiny that could interrupt the scheme. After Columbia knew iCap was operating fraudulently, the agreement also had the unlawful objective of sustaining the continuing fraud.

151. The agreement is shown circumstantially by the repeated reciprocal communications and coordinated conduct alleged above: Tzekov's close relationship with Chris Christensen; her assistance with daily transactions and



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

cash; her effort to obtain employment from iCap; her repeated assistance with intercompany and personal transfers; the Bank's inconsistent treatment of known high-risk and out-of-pattern activity as normal; its inaccurate remote-deposit-capture information; and its continued assistance after repeated institutional reviews.

152. Tzekov acted within the actual or apparent authority Columbia granted her concerning the iCap relationship and transactions. Columbia management approved the effort to retain iCap and ratified the coordinated course of conduct by maintaining the accounts, retaining the deposits, accepting the resulting fees, and continuing assistance despite the Bank's institutional knowledge.

153. In furtherance of the conspiracy, Columbia committed the overt acts alleged above, including maintaining investor-funded accounts, facilitating shortfall-covering and insider transfers, processing unexplained physical cash, treating irregular activity as normal, and continuing the banking relationship and transaction assistance after identifying iCap as high risk.

154. The acts undertaken pursuant to and in furtherance of the agreement enabled iCap to continue soliciting, receiving, commingling, and diverting investor funds and were a direct and proximate cause of the losses suffered by Tan and the Class.

155. Columbia is jointly and severally liable for damages caused by wrongful acts committed by members of the conspiracy in furtherance of its common purpose, in an amount to be established at trial.

**COUNT VI — UNJUST ENRICHMENT**



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

156. Plaintiff realleges and incorporates by reference each preceding paragraph as though fully set forth here.

157. Tan and the Class conferred direct and traceable benefits on Columbia by transmitting investment consideration into accounts maintained at the Bank, thereby increasing the deposits on which Columbia earned treasury-management fees, transaction fees, charges, and the use of substantial investor-funded balances.

158. Columbia knew of and appreciated those benefits. It knew that the account balances and transactions were funded principally by investors, described iCap as a very profitable relationship, and reported recurring treasury-management fee income of approximately $2,000 to $4,000 per month.

159. Columbia's retention of those benefits is inequitable because, with the knowledge alleged above, it continued the relationship and provided assistance that enabled iCap to receive, commingle, transfer, and dissipate the investor funds from which Columbia's benefits were derived.

160. Tan and the Class are entitled to restitution or disgorgement of the benefits Columbia unjustly retained in an amount to be proven.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court:

161. Certify this action under CR 23, appoint Tan as Class Representative, and appoint Plaintiff's counsel as Class Counsel;



BENDER LAW PLLC
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 206.577.7987 | F: 206.693.4365

162. Enter judgment in favor of Plaintiff and the Class and against Columbia on each claim sustained;

163. Award compensatory damages in an amount to be proven at trial;

164. Award restitution or disgorgement of the amounts by which Columbia was unjustly enriched;

165. Award the remedies provided by RCW 21.20.430, including consideration paid or damages, statutory interest, costs, and reasonable attorneys' fees, as applicable;

166. Award pre- and post-judgment interest at the maximum lawful rate;

167. Award Plaintiff's reasonable attorneys' fees, expenses, and costs as permitted by law; and

168. Grant such other and further relief as the Court deems just and equitable.

DATED this 14th day of September 2026.

BENDER LAW | PLLC

*/s/ John Bender*

John Bender, WSBA 19540
Christian Flowers, WSBA 63990
450 Alaskan Way South | Suite 200
Seattle, Washington 98104
(206) 577-7987
E-mail: john@bender-law.com
E-mail: christian@bender-law.com

*Attorneys for Plaintiff and the Proposed Class*